T.C. Memo. 2011-128


UNITED STATES TAX COURT



AARON KIRMAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 22461-08.                    Filed June 8, 2011.



        R found additional interest income, disallowed certain
business expense deductions and itemized deductions P
claimed on his 2005 tax return, and determined a deficiency
in income tax and an accuracy-related penalty under sec.
6662(a), I.R.C., for P's 2005 tax year.

        <u>Held</u>:  P is liable for the deficiency to the
extent decided herein.

        <u>Held</u>, <u>further</u>, P is liable for the accuracy-related
penalty under sec. 6662(a), I.R.C.



<u>Adam L. Karp</u> and <u>Samuel C. Landis</u>, for petitioner.

<u>Sarah A. Herson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  This case is before the Court on a petition for redetermination of an income tax deficiency and a section 6662(a) accuracy-related penalty that respondent determined for petitioner's 2005 tax year.[1]  After concessions by the parties,[2] the issues for determination are:  (1) Whether petitioner is entitled to certain deductions claimed on Schedule C, Profit or Loss From Business; (2) whether petitioner is entitled to a deduction claimed on Schedule A, Itemized Deductions, for

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]At the recall of this case on Mar. 8, 2010, the parties presented a stipulation of settled issues which is incorporated by this reference.  The parties later agreed to two additional oral stipulations which were read into the record at trial on Mar. 12, 2010, and which are also incorporated by this reference. The parties agreed to the following:  (1) Petitioner is entitled to a $1,750 Schedule C deduction for insurance expenses; (2) petitioner is liable for income taxes on $2,301 of interest income; (3) petitioner is not entitled to a $38,740 Schedule C deduction for wage expenses; (4) petitioner is entitled to a $1,200 Schedule C deduction for travel expenses; (5) petitioner is entitled to a $13,418 Schedule C deduction for legal and professional services expenses; (6) petitioner is entitled to a $55,177 Schedule C deduction for commissions and fees expenses; (7) petitioner is not entitled to a  $40,000 deduction for self-employed SEP, simple, and qualified plans expenses; (8) petitioner is not entitled to a $3,228 Schedule A deduction for home mortgage interest; (9) petitioner is entitled to an $8,170 Schedule C deduction for car and truck expenses; and (10) petitioner is entitled to a $5,168 Schedule C deduction for meals and entertainment expenses, computed after the 50 percent limitation.

charitable contributions; and (3) whether petitioner is liable for a section 6662(a) accuracy-related penalty.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulated facts, with accompanying exhibits, are incorporated herein by this reference. At the time his petition was filed, petitioner resided in California.

During 2005 petitioner worked as a real estate agent, working at two different agencies during the year. He began the 2005 tax year working at Mossler, Deasy, & Doe but then transferred to Hilton & Hyland.

Petitioner hired Raul Urquiola to prepare his 2005 Form 1040, U.S. Individual Income Tax Return. Mr. Urquiola graduated from California State University in 1974 with a degree in accounting. Mr. Urquiola did not prepare tax returns full time; rather, he did it "on the side". Petitioner told Mr. Urquiola that his files were unorganized; but Mr. Urquiola assured petitioner that if he brought his source documentation, they would "go through it together". Petitioner, who had never prepared a tax return, relied entirely on Mr. Urquiola to prepare his 2005 tax return.

Respondent received petitioner's 2005 Form 1040 on June 5, 2006. On the attached Schedule C, petitioner reported gross receipts or sales of $608,683 and claimed total business expense

deductions of $335,942. On the attached Schedule A, petitioner claimed total itemized deductions of $38,859.

Respondent inter alia disallowed $231,445 of petitioner's claimed Schedule C deductions and $21,197 of petitioner's claimed Schedule A deductions and on August 19, 2008, issued a notice of deficiency showing a deficiency in income tax of $105,889 and a section 6662(a) accuracy-related penalty of $21,177.80 for petitioner's 2005 tax year. Petitioner timely petitioned this Court. Trial was held on March 12, 2010, in Los Angeles, California. The parties have conceded several issues. See supra note 2. The remaining issues center around whether petitioner has adequately substantiated certain deductions that he claimed on Schedules A and C of his 2005 tax return and the applicability of the section 6662(a) accuracy-related penalty.

OPINION

I. Preliminary Evidentiary Matters

At trial petitioner attempted to introduce into evidence stipulated Exhibits 3-P through 8-P, 10-P, and 12-P, which in the stipulations noted certain objections by respondent. Respondent objected, and the Court reserved ruling on the admissibility of the exhibits. We apply the Federal Rules of Evidence applicable in nonjury trials in the U.S. District Court for the District of Columbia. Sec. 7453; Rule 143(a); see Clough v. Commissioner, 119 T.C. 183, 188 (2002).

A.  <u>Exhibits 3-P and 4-P</u>

Exhibit 3-P is a one-page document dated February 1, 2010, entitled "Aaron B. Kirman Profit & Loss January through December 2005".  Exhibit 4-P is a 66-page document dated February 1, 2010, entitled "Aaron B. Kirman General Ledger as of December 31, 2005".  Respondent, in the stipulation, objected to both exhibits on the grounds of hearsay and relevancy, and at trial on the additional ground of authentication.

Rule 801(c) of the Federal Rules of Evidence defines "Hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Hearsay is generally excluded from evidence unless an exception applies.  See Fed. R. Evid. 802; <u>Snyder v. Commissioner</u>, 93 T.C. 529, 532 (1989).

Rule 401 of the Federal Rules of Evidence defines "Relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Rule 901(a) of the Federal Rules of Evidence provides that "The requirement of authentication or identification * * * is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Rule 901(b) of the Federal Rules of Evidence sets forth a nonexclusive list of

"examples of authentication or identification conforming with the requirements of [rule 901]".

We first address respondent's assertion that Exhibits 3-P and 4-P were not properly authenticated. In the stipulation, the parties stipulated that "all exhibits referred to herein and attached hereto may be accepted as authentic and are incorporated in this stipulation and made a part hereof; provided, however, that either party has the right to object to the admission of any such facts and exhibits in evidence on the grounds of materiality and relevancy". Therefore, we find that respondent has conceded the authenticity of all the stipulated exhibits.

We now turn to respondent's hearsay objection. We find that Exhibits 3-P and 4-P are hearsay. We have not found an applicable exception to the hearsay rule, nor has petitioner advanced one. Petitioner might conceive that Exhibit 4-P is a record of his regularly conducted activities. However, because Exhibit 4-P was not made "at or near the time" the expenses listed on Exhibit 4-P were allegedly incurred, it does not fall within the exception to hearsay for records of regularly conducted activities. See Fed. R. Evid. 803(6).

Finally, we look to see whether rule 1006 of the Federal Rules of Evidence, which provides that the contents of voluminous writings that cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation, is

grounds for admitting either exhibit. We find that rule 1006 does not justify the admission of this evidence. Petitioner provided no information about who created either exhibit or when either was created. He further provided no information about the sources of all of the amounts listed in Exhibit 3-P. While we can ascertain that most of the amounts listed in Exhibit 4-P came from Exhibits 5-P and 6-P, there is information in Exhibit 4-P such as payee names that we do not know the source of. Additionally, Exhibit 4-P is a breakdown of petitioner's expenses, yet petitioner never provided information as to how he categorized each expense. Accordingly, we sustain respondent's objections to Exhibits 3-P and 4-P.

B.  Exhibits 5-P, 6-P, 7-P, and 8-P

Exhibit 5-P is copies of petitioner's monthly American Express credit card statements for January 3 through December 18, 2005. Exhibit 6-P is copies of petitioner's monthly bank statements for a Platinum Checking Account at Washington Mutual Bank for December 21, 2004, through December 20, 2005. Exhibit 7-P is copies of petitioner's monthly bank statements for a Gold Overdraft Line of Credit Checking Account at Washington Mutual Bank for December 8, 2004, through December 7, 2005. Exhibit 8-P is copies of petitioner's monthly bank statements for a Portfolio Management Account with Wells Fargo for January 1 through December 31, 2005.

Respondent objected to Exhibits 5-P through 8-P on the grounds of hearsay, relevancy, and authentication.  As discussed above, we find that respondent has conceded the authenticity of the disputed exhibits.  All four exhibits are relevant because they tend to make the issue of whether petitioner incurred and paid deductible expenses more or less likely.

With regard to the hearsay objection, respondent asserts that the exhibits do not fit within rule 803(6) of the Federal Rules of Evidence because petitioner has not provided declarations or certifications that the four exhibits meet the requirements of that rule.

Rule 803(6) of the Federal Rules of Evidence is a hearsay exception for records of regularly conducted activity.  Pursuant to rule 803(6), the following are not excluded on the basis of hearsay:

> A memorandum, report, record, or data compilation, in any
> form, of acts, events, conditions, opinions, or diagnoses,
> made at or near the time by, or from information transmitted
> by, a person with knowledge, if kept in the course of a
> regularly conducted business activity, and if it was the
> regular practice of that business activity to make the
> memorandum, report, record or data compilation, all as shown
> by the testimony of the custodian or other qualified
> witness, or by certification that complies with Rule
> 902(11), 902(12), or a statute permitting certification
> * * *

Under rules 902(11) and (12) of the Federal Rules of Evidence, a certification includes a written declaration of a custodian or other qualified person certifying that a record

(A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

(B) was kept in the course of the regularly conducted activity; and

(C) was made by the regularly conducted activity as a regular practice.

Petitioner did not provide any declarations or certifications that Exhibits 5-P through 8-P meet the requirements of rule 803(6) of the Federal Rules of Evidence. Consequently, respondent was never afforded a fair opportunity to challenge them and the underlying exhibits. We recognize that in Oglesby v. Commissioner, T.C. Memo. 2011-93, we held that the business records exception was satisfied when the taxpayer established through testimony that receipts from a maintenance shop should be considered the taxpayer's own business records. In Oglesby, we held it irrelevant that a representative from the maintenance shop failed to build a foundation for the receipts. Here, because we find that rule 807 of the Federal Rules of Evidence provides a basis for admitting Exhibits 5-P through 8-P, we need not reach a decision as to whether Oglesby and the cases cited therein could potentially apply in this case. We note that petitioner did not testify regarding the documents or his business records, unlike the taxpayer in Oglesby.

Under rule 807 of the Federal Rules of Evidence, hearsay not covered by the exceptions in rules 803 or 804 of the Federal

Rules of Evidence, but having equivalent circumstantial guaranties of trustworthiness, is not excluded by rule 802 of the Federal Rules of Evidence

> if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of * * * [the Federal Rules of Evidence] and the interests of justice will best be served by admission of the statement into evidence.  * * *

Rule 801(a) of the Federal Rules of Evidence defines "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion."  As Exhibits 5-P through 8-P are written assertions, they are statements within the meaning of rule 807 of the Federal Rules of Evidence.

We find that rule 807 provides a sound basis for admitting these documents.[3]  We are convinced that the exhibits possess circumstantial guaranties of trustworthiness equivalent to those of the other hearsay exceptions.  According to their dates, they were produced by financial institutions at or near the time the

---

[3]Fed. R. Evid. 807 also provides that "a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement, and the particulars of it, including the name and address of the declarant".  Respondent did not argue that he did not receive the stipulated exhibits in time.  Further, it appears that the exhibits were submitted at least 2 weeks before trial in accordance with this Court's pretrial order.

event recorded occurred, are material, and are probative on the issue of whether petitioner incurred and paid deductible expenses. Accordingly, we admit Exhibits 5-P through 8-P into evidence. See Karme v. Commissioner, 673 F.2d 1062, 1065 (9th Cir. 1982) (rule 807 of the Federal Rules of Evidence authorizes a court to admit a record into evidence so long as the record is material, probative, and trustworthy), affg. 73 T.C. 1163 (1980); see also United States v. Linn, 880 F.2d 209, 216 (9th Cir. 1989) (the Court of Appeals for the Ninth Circuit has granted lower courts broad discretion to decide whether a particular record is trustworthy).

C. Exhibit 10-P

Exhibit 10-P is a 34-page document apparently printed from the Internet on February 15, 2010. Each page of Exhibit 10-P contains information such as prices and closing dates, as well as handwritten notes, for various houses petitioner claims to have sold during 2005. Respondent objected on grounds of hearsay and authentication. As discussed above, we find that respondent has conceded that the exhibits were properly authenticated. Petitioner argues that Exhibit 10-P meets the hearsay exceptions under rules 803(6), 803(8), and 807 of the Federal Rules of Evidence.

As with Exhibits 5-P through 8-P, petitioner provided no declaration or certification that Exhibit 10-P meets the

requirements of rule 803(6) of the Federal Rules of Evidence. Accordingly, Exhibit 10-P does not meet the rule 803(6) exception for records of regularly conducted activity.  Rule 803(8) of the Federal Rules of Evidence provides an exception to the hearsay rule for:  "Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency".  Petitioner has not presented any evidence to establish that the Web site from which Exhibit 10-P was printed is that of a public office or agency, and therefore Exhibit 10-P does not meet the exception to hearsay provided in rule 803(8) of the Federal Rules of Evidence.

We are not convinced that rule 807 of the Federal Rules of Evidence provides a basis for admitting Exhibit 10-P.  Exhibit 10-P contains handwritten notes that petitioner never even attempted to explain to the Court, and the Web site from which it was printed is not generally accessible absent registration and payment of a fee.  And while Exhibit 10-P does contain prices of certain properties petitioner sold, a price is not proof of actual payment or even who was paid a commission upon sale of the property.  Accordingly, we sustain respondent's objection that Exhibit 10-P is hearsay that does not fit within an exception.[4]

---

[4]At trial, petitioner placed emphasis on the Web site from which Exhibit 10-P was printed, comparing a price listed in Exhibit 10-P to a stock price, stating:  "without having a
(continued...)

Even though we have found that Exhibit 10-P constitutes hearsay, we realize that some of the information in Exhibit 10-P can be verified and confirmed through other publicly available sources such as county government recording and assessment records, various real estate listing services, and news media reports.  Therefore, we will, to the extent possible, take judicial notice that certain properties were sold for certain prices and on certain dates.  See Fed. R. Evid. 201(b) (matters may be so capable of verification by resort to sources whose accuracy cannot reasonably be questioned as to be beyond reasonable dispute and hence proper subjects of judicial notice).

D.  Exhibit 12-P

Exhibit 12-P is a 25-page document consisting of third-party declarations and invoices.  Exhibit 12-P contains 12 declarations, 3 from witnesses and 9 from nonwitnesses. Respondent objected to the declarations on the grounds of hearsay that he was prejudiced because he did not have an opportunity to

---

[4](...continued)
witness here to testify from the Securities or Exchange Commission or an affidavit signed by an employee of the SEC, I believe the Court might be able to consider evidence of the price of a stock at the time in question." One problem with this Court's accepting as evidence the price and sell date of houses listed in Exhibit 10-P is that we have found conflicting information.  For example, 1900 Westholme Avenue is listed in Exhibit 10-P as having been sold for $1,475,126 on Feb. 3, 2005, but other Internet sources apparently list this same property as having been sold for $1,475,500 on Dec. 14, 2004.  The discrepancies are exacerbated by the fact that petitioner himself and not a third party prepared the information in Exhibit 10-P.

cross-examine the declarants and that petitioner made no showing that the declarants were unavailable.  See Fed. R. Evid. 804, 806.  The declarations from the three witnesses follow their trial testimony and add no new evidence to the record.  With regard to the additional declarations, respondent was denied the chance to cross-examine those witnesses, and petitioner provided no evidence that any of the declarants was unavailable.  Additionally, Exhibit 12-P was not provided to respondent within 14 days of trial.  Accordingly, we sustain respondent's objections to the declarations.

Page 11 of Exhibit 12-P is a declaration of Michael J Park, and pages 12 through 22 are invoices of "M.J. PARK GENERAL CONTRACTOR/RESIDENTIAL INSPECTION SERVICE".  Petitioner requested that the Court admit pages 11 through 22 under the business records exception to hearsay, asserting that page 11 of Exhibit 12-P meets the declaration or certification requirement of rule 803(6) of the Federal Rules of Evidence because it was signed and dated.  We are not persuaded by petitioner that signing and dating something satisfies rule 803(6) of the Federal Rules of Evidence.  Accordingly, we sustain respondent's objection.

## II.  Burden of Proof

In general, the Commissioner's determination of a taxpayer's tax liability is presumed correct, and the taxpayer bears the burden of proving that the Commissioner's determination is

improper.  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Pursuant to section 7491(a), the burden of proof as to factual matters shifts to the Commissioner under certain circumstances.  Petitioner has neither alleged that section 7491(a) applies nor established his compliance with the substantiation and recordkeeping requirements.  See sec. 7491(a)(2)(A) and (B).  Petitioner therefore bears the burden of proof.

This case revolves around certain claimed deductions on Schedules A and C of petitioner's 2005 tax return.  Deductions are a matter of legislative grace, and taxpayers bear the burden of proving entitlement to any claimed deduction.  Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992).  Taxpayers are required to identify each deduction available and show that they have met all requirements as well as to keep books or records to substantiate all claimed deductions.  Sec. 6001; <u>Roberts v. Commissioner</u>, 62 T.C. 834, 836-837 (1974).

Under <u>Cohan v. Commissioner</u>, 39 F.2d 540, 543-544 (2d Cir. 1930), if a taxpayer claims a deduction but cannot fully substantiate it, the Court, subject to certain exceptions, may approximate the allowable amount, bearing heavily against the taxpayer whose inexactitude in substantiating the amount of the deduction is of his own making.  However, in order for the Court to estimate the amount of a deduction, the Court must have some

basis upon which an estimate may be made.  <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 742-743 (1985).  Without such a basis, any allowance would amount to unguided largesse.  <u>Williams v. United States</u>, 245 F.2d 559, 560-561 (5th Cir. 1957).

III.  <u>Whether Petitioner Is Entitled to Certain Expense Deductions Claimed on Schedule C</u>

After the parties' concessions, the remaining issues relating to expense deductions claimed on Schedule C are:  (1) Whether petitioner is entitled to deduct $7,665 for travel expenses in addition to $1,200 already conceded by respondent; (2) whether petitioner is entitled to deduct $5,750 for insurance (other than health) expenses in addition to $1,750 already conceded by respondent; (3) whether petitioner is entitled to deduct $90,781 for commissions and fees expenses in addition to $55,177 already conceded by respondent; (4) whether petitioner is entitled to deduct $13,750 for advertising expenses; and (5) whether petitioner is entitled to deduct $133,500 for repairs and maintenance expenses.

Section 162(a) authorizes a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  A trade or business expense is ordinary for purposes of section 162 if it is normal or customary within a particular trade, business, or industry and is necessary if it is appropriate and helpful for the development

of the business.  Commissioner v. Heininger, 320 U.S. 467, 471 (1943); Deputy v. du Pont, 308 U.S. 488, 495 (1940).

A.  Travel Expenses

On his 2005 Schedule C petitioner claimed an $8,865 deduction for travel expenses, but he now contends he should have claimed $11,092.  Respondent conceded that petitioner was entitled to a $1,200 deduction for travel expenses he incurred on a trip to Las Vegas.  Petitioner testified that in 2005 he traveled to Brazil, Sydney, and London on business matters and to Greece for personal matters.  He spent 12 days in Brazil, 5 days in Sydney, and 2 days in London.  Petitioner asserts that his trip to Brazil was 70 percent business and his trip to London 100 percent business; and while he first claimed his trip to Sydney was 100 percent business, he later acknowledged that he also did sightseeing there.

A deduction is allowed for ordinary and necessary travel expenses incurred while away from home in the pursuit of a trade or business.  Sec. 162(a)(2); see Bruns v. Commissioner, T.C. Memo. 2009-168.  If a taxpayer travels to a destination at which he engages in both business and personal activities, the travel expenses to and from the destination are deductible only if the trip is related primarily to the taxpayer's trade or business.  Sec. 1.162-2(b)(1), Income Tax Regs.

In order to deduct travel expenses, taxpayers must not only satisfy the general requirements of section 162; they must also satisfy the strict substantiation requirements of section 274(d). No deduction is allowed for expenses incurred for travel away from the taxpayer's home (including meals and lodging) unless the taxpayer substantiates, by adequate records or by sufficient evidence corroborating the taxpayer's own statement, each of the following elements: (1) The amount of each separate expenditure; (2) the dates of departure and return and the number of days spent on business; (3) the place of destination by name of city or town; and (4) the business reason or expected business benefit from the travel. Sec. 274(d); sec. 1.274-5T(b)(2), (c), Temporary Income Tax Regs., 50 Fed. Reg. 46014, 46016 (Nov. 6, 1985).

Additionally, for foreign travel, section 274(c)(1) generally disallows a deduction for the portion of the foreign travel expenses that is not allocable to the income-producing activity. See sec. 1.274-4(f), Income Tax Regs. Section 274(c)(1) does not apply if the travel does not exceed 1 week or the portion of the time of travel outside the United States which is not attributable to the pursuit of the taxpayer's trade or business is less than 25 percent of the total time on such travel. The Cohan doctrine cannot be used to estimate a deduction for travel expenses. Schladweiler v. Commissioner,

T.C. Memo. 2000-351, affd. 28 Fed. Appx. 602 (8th Cir. 2002); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

Petitioner never provided evidence to establish the dates he departed and returned or the cities in Brazil he visited. Further, while he testified as to his alleged business reasons for each trip, he never provided any documentary evidence supporting his testimony.  Even if the Court were to admit Exhibit 4-P into evidence, it does not contain the necessary information including the business purpose behind each expense or the city petitioner was in when each expense was incurred. Because of these deficiencies, petitioner has not met his burden of proof.  We sustain respondent's determination and hold that petitioner is not entitled to a greater deduction for travel expenses than that already conceded by respondent.

B.  Insurance (Other Than Health) Expenses

On Schedule C, petitioner claimed a $7,500 deduction for insurance (other than health) expenses.  Mr. Urquiola arrived at $7,500 on the basis of what petitioner told him; he does not recall seeing a bill or a receipt.  Respondent conceded that petitioner is entitled to a $1,750 deduction for insurance (other than health) expenses.[5]

---

[5]Even though petitioner argues he is entitled to his total claimed deduction of $7,500, petitioner also acknowledges that he proved only an additional $3,000 of insurance (other than health)
(continued...)

Petitioner's claimed insurance expenses were for "errors and omissions" insurance. The two real estate agencies petitioner worked for during 2005 had different errors and omissions insurance policies. Hilton & Hyland required agents to pay a flat fee of $1,750 for the year no matter how many houses they sold. Even though petitioner worked only part of the year at Hilton & Hyland, the $1,750 fee was not prorated. Respondent's concession that petitioner was entitled to a $1,750 deduction for insurance expenses was based on petitioner's payment to Hilton & Hyland for errors and omissions insurance.

Mossler, Deasy, & Doe charged $250 per transaction for errors and omissions insurance. Petitioner did not write a check or hand over cash each time he sold a house; rather, each time he sold a house, the $250 was paid out of escrow.

From the record, petitioner's argument appears to be that he sold 12 houses while working at Mossler, Deasy, & Doe, that he paid $3,000 for errors and omissions insurance on account of these 12 houses, and therefore that he is entitled to a $3,000 deduction. However, petitioner never introduced documentation of Mossler, Deasy, & Doe's policy regarding errors and omissions insurance. Further, even if we were to admit Exhibit 10-P, because it contains no proof of payment it does not, by itself, substantiate his claimed deduction.

---

[5](...continued)
expenses at trial.

Most importantly, petitioner claims that he has no proof of payment because the $250 per transaction was paid directly from escrow before he received his commission.  Petitioner never provided documentation establishing this policy.  In any event, if $250 was paid directly out of escrow for errors and omissions insurance before petitioner received his commission check, petitioner would need to establish that he included $250 per sale in his gross income.  He did not do this.  If petitioner never included these amounts in gross income, he would not be entitled to an offsetting deduction.  Therefore, we sustain respondent's determination on this issue and hold that petitioner is not entitled to a greater deduction for insurance (other than health) expenses than that allowed by respondent.[6]

C.  Commissions and Fees Expenses

On his 2005 Schedule C, petitioner claimed a $55,440 deduction for commissions and fees expenses.  Mr. Urquiola testified that he arrived at $55,440 on the basis of handwritten receipts provided by petitioner.   Respondent conceded that petitioner is entitled to a deduction of $55,177 for commissions and fees expenses.  Petitioner now claims he is entitled to a $145,958 deduction for commissions and fees expenses, a $90,781 increase from $55,177 conceded by respondent.

---

[6]The lack of evidence precludes the application of the Cohan doctrine.  See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).

Generally, in a real estate transaction a contract is signed with a specified commission; and when the property is sold, the selling agent and the buying agent split the commission in a predetermined manner. Further, agents will sometimes split their commission with other agents who assisted them with the listing or referred the property to them. Petitioner testified that he paid approximately 30 percent of his commission in referral fees. Additionally, the real estate agency receives an override of the agent's commission, in this instance 20 percent.

The record does not reveal exactly how petitioner handled his commissions. Petitioner testified about four specific houses he sold in 2005. The first was 15560 Woodvale Road, from the sale of which petitioner made a commission of $44,000, keeping $17,600 and paying $26,400 to other agents. On the second, 1151 Maybrook Drive, the total commission was allegedly $60,000, of which petitioner kept $24,000 and paid $36,000 to other agents. On the third, 11535 Rochester Avenue No. 301, the total commission was $16,975, of which petitioner claimed he kept $6,790 and paid $10,185 to other agents. On the fourth, 1900 Westholme Avenue, the total commission was $36,878, of which petitioner testified he kept $14,751 and paid $22,127 to other agents.[7]

---

[7]Petitioner claims he sold 1900 Westholme Avenue in 2005. However, the record is not clear whether 1900 Westholme Avenue was sold in 2005 or in 2004.

David Mimoun, another agent who worked with petitioner on the sales of the four houses, testified that the commissions were split 50-50 between himself and petitioner but that his father (Mr. Mimoun Senior) always took half of his commissions and may have taken some portion of petitioner's commissions. Hence, petitioner's and Mr. Mimoun's memories regarding how much commission petitioner paid to other agents may in some respects contradict each other.

Petitioner relies on his self-serving and uncorroborated testimony as well as Exhibits 9-P and 10-P to substantiate his claimed deduction. However, the exhibits do not support petitioner's position as neither contains proof of payment. In fact, petitioner has not provided this Court with any proof of payment and admits that he does not have any canceled checks or other documentation. Petitioner claims he is entitled to a $145,958 deduction. But Mr. Urquiola testified that at most petitioner had provided to him documentation indicating he was entitled to a deduction of $55,440.

If a taxpayer establishes a deductible expense but is unable to substantiate the precise amount, we may, after "bearing heavily * * * upon the taxpayer whose inexactitude is of his own making", estimate the amount, provided we are convinced that the taxpayer incurred such an expense and we have a basis upon which to make an estimate. Cohan v. Commissioner, 39 F.2d at 543-544;

Vanicek v. Commissioner, 85 T.C. at 743. We believe that petitioner incurred the commissions and fees expenses originally claimed on his 2005 Schedule C and, therefore, hold that he is entitled to a total deduction for commissions and fees expenses of $55,440, an increase of $263 from that conceded by respondent.

D. Advertising Expenses

On his 2005 Schedule C, petitioner claimed a $12,756 deduction for gifts. At trial and on brief, petitioner claimed that the amount expended was actually $13,750 and that the expenditure should have been classified as an advertising expense and not a gift expense.

The $13,750 expenditure arises from petitioner's claim that he bought two pictures for a client in an attempt to get the client to let petitioner retain the client's real estate listing when petitioner transferred to another real estate agency. According to petitioner, he "bought what was some expensive art as an alternative marketing means to be able to show my commitment to selling the property". Petitioner does not know whether the paintings will stay with the house when it is sold or the client is going to take them along with other personal property.

Advertising expenses to promote a taxpayer's trade or business are deductible pursuant to section 162(a). Brallier v. Commissioner, T.C. Memo. 1986-42; sec. 1.162-1(a), Income Tax

Regs. The test for deductibility is whether the taxpayer reasonably intended that the expenditure would advertise his business. See <u>Rodgers Dairy Co. v. Commissioner</u>, 14 T.C. 66 (1950).

Petitioner argues that the paintings given to his client were "not a gift in the traditional sense [and limited to a deductible maximum amount of $25 by section 274(b)(1)], but rather a needed advertising expense to sell the house". Yet petitioner never established that the paintings promoted his business or even helped sell the house. He even acknowledged it was unclear whether the paintings would be sold with the house or retained by his client. Even if petitioner had proven that the paintings generated business and were therefore "advertising" expenses, petitioner has not substantiated this deduction. Petitioner relies on his testimony and a line in Exhibit 4-P, which was not admitted into evidence, stating that two checks for $6,875 each, dated April 1, 2005, were paid to Scott Lurie and Craig Lurie but does not indicate what the payment was for. Petitioner has not sufficiently substantiated his claimed deduction, and accordingly, we sustain respondent's determination and hold that petitioner is not entitled to an additional $13,750 deduction for advertising expenses.[8]

---

[8]The lack of evidence precludes the application of the <u>Cohan</u> doctrine. See <u>Cohan v. Commissioner</u>, 39 F.2d at 543-544.

E.  Repairs and Maintenance Expenses

On his 2005 Schedule C, petitioner claimed a $57,546 deduction for repairs and maintenance expenses.  Mr. Urquiola testified that he arrived at this number on the basis of "Ninety percent of receipts".  Later, at trial and on brief, petitioner argued that he had incurred at least $133,500 of repairs expenses even though petitioner's attorney, Mr. Karp, acknowledged that there "is very little documentation to substantiate" even the $57,546 claimed as a deduction on petitioner's tax return. Petitioner arrived at $133,500 by relying on his memory and trial testimony as to different properties he repaired before selling.

Petitioner testified as to the following properties and amounts:  (1) 17450 Rancho Street--between $12,000 and $15,000; (2) 1151 Maybrook Drive--$10,000; (3) 527 Whiting Woods--$3,000; (4) 1061 Laguna Avenue--$3,000; (5) 15045 Sunstone Place--$5,000; (6) 9091 Wonderland Park Avenue--$3,000; (7) 3012 Roscomare Road--$7,000; (8) 5757 Trancas Canyon Road--$10,000; (9) 17425 Tramonto Drive--$10,000; (10) 21900 Briarbluff Street--$5,500; (11) 666 Sarbonne Road--$7,000; and (12) 5371 Vanalden Avenue-$1,000.[9]  Yet petitioner never offered any receipts or other documentary evidence as to the repairs he allegedly made.

---

[9]Petitioner's testimony regarding 5757 Trancas Canyon Road and 17425 Tramonto Drive is confusing.  He initially testified he spent $10,000 in grading repairs for 5757 Trancas Canyon Road but then retracted his testimony, correcting it by stating that he actually spent $10,000 in grading repairs for 17425 Tramonto Drive and did not make repairs for 5757 Trancas Canyon Road.

According to petitioner, he had receipts but "lost [my] box", and while he allegedly paid with checks, he could not find or made no attempt to find copies of the canceled checks.

Mr. Mimoun testified that 1151 Maybrook Drive had several problems including the tennis courts, a pool, the driveway, and water pumps. He stated that he contributed $10,000 to help cover the cost of the repairs and that petitioner was required to match this amount, yet Mr. Mimoun also indicated that the cost of the repairs was paid out of "the syndicate checkbook" and his father "controlled the funds". Woodvale Road was a property petitioner bought into as an investment property for which, according to Mr. Mimoun's "best * * * knowledge", petitioner contributed $30,000 for repairs.

Mr. Mimoun explained that two of the properties petitioner sold needed repairs, but it is unclear who actually paid for the repairs. Petitioner did not carry his burden of proving that he paid for the repairs, as opposed to having the cost of the repairs taken out of his commission, or that he alone paid for the repairs instead of splitting the cost with other agents. If the costs were paid from his commission, the record does not explain whether he reported the gross or the net commission as his taxable income. This shortcoming is exacerbated by real estate agent David Kramer's testimony that it is "rare that [we will] pay in advance" for repairs and similar things.

In total the record does establish that in order to prepare some of the properties for sale, petitioner incurred some repairs and maintenance expenses.  The Court will not, however, allow petitioner a $133,500 deduction that is based almost exclusively on his and Mr. Mimoun's testimony.  Using our best judgment and the record before us, we hold that petitioner is entitled to a repairs and maintenance expenses deduction of $19,182, none of which is attributable to the Woodvale Road property.[10]  See Cohan v. Commissioner, 39 F.2d at 543-544.

---

[10]We would treat the Woodvale Road property expenses to the extent, if any, that they have been substantiated as an investor's capital contribution.  See, e.g., secs. 162, 704, 1001.

We come up with $19,182 on the basis of petitioner's testimony, Mr. Urquiola's testimony, Mr. Mimoun's testimony, and petitioner's supporting statement to his 2005 Schedule C contained in Exhibit 1-J.  The supporting statement indicates that his originally claimed repairs and maintenance expenses comprised painting--$8,943, landscaping--$9,894, fences--$7,340, doors and windows--$6,990, pool maintenance and repairs--$5,922, carpet repairs--$5,128, tile floor repairs--$3,784, and occasional labor--$9,545 for total expenses of $57,546.  This Court is persuaded that petitioner incurred some maintenance and repairs expenses although he does not provide receipts or canceled checks.  On the basis of petitioner's testimony (including the additional amounts claimed at trial, but excluding the claimed $30,000 Woodvale Road property expense) and that of Mr. Mimoun regarding repairs made to specific houses, and Mr. Urquiola's testimony that he arrived at $57,546 using "ninety percent of receipts", we will allow petitioner one-third of the amount listed on Schedule C, or $19,182.  In doing so we have borne heavily upon the taxpayer whose lack of records is the principal cause of our inexactitude.

IV.  Whether Petitioner Is Entitled to A Deduction for Charitable
     Contributions

After the parties' concessions, the sole issue remaining with regard to petitioner's claimed Schedule A deductions is whether petitioner is entitled to a $9,850 itemized deduction for charitable contributions by cash or check.  Section 170(a)(1) allows a deduction for a charitable contribution as defined in section 170(c) if verified under applicable regulations. Generally, a cash contribution can be substantiated by (1) a canceled check, (2) a receipt from the donee organization, or (3) other reliable written records showing the name of the donee, the date of the contribution, and the amount of the contribution. Sec. 1.170A-13(a)(1), Income Tax Regs.  For a contribution of $250 or more, a taxpayer must substantiate the contribution by a written acknowledgment by the donee organization.[11]  Sec. 170(f)(8)(A).  The written acknowledgment must include:

> (i) The amount of cash and a description (but not value) of any property other than cash contributed.

> (ii) Whether the donee organization provided any goods or services in consideration, in whole or in part, for any property described in clause (i).

> (iii) A description and good faith estimate of the value of any goods or services referred to in clause (ii) or, if such goods or services consist solely of intangible religious benefits, a statement to that effect.

---

[11]Separate contributions of less than $250 are not subject to the requirements of sec. 170(f)(8), regardless of whether the sum of the contributions made by a taxpayer to a donee organization during a taxable year equals $250 or more.  See sec. 1.170A-13(f)(1), Income Tax Regs.

Sec. 170(f)(8)(B). To be considered contemporaneous, the written acknowledgment must be obtained by the taxpayer before the earlier of the due date of the return, including extensions, or the filing of the return. Sec. 170(f)(8)(C).

Petitioner testified that he donated money to the Architectural Historical Society in "an attempt to get into the right community that" had access to architectural homes. He claimed that the amount he donated was $7,000 or $8,000 but admitted that he could neither "remember the exact amount" nor find the canceled check.[12]

Petitioner has not met the requirements of section 170. First, he failed to prove that the Architectural Historical Society was an organization specified in section 170(c). Second, he failed to adequately substantiate his claimed charitable contribution or meet the requirements of section 170(f)(8)(A). The evidence relating to the claimed charitable contribution is limited to petitioner's trial testimony and is unsupported by any written substantiation in the form of canceled checks, bank records, or receipts from the donee organization.

---

[12]While petitioner testified that he donated money to the Architectural Historical Society, Mr. Urquiola testified that he arrived at petitioner's claimed charitable contribution using petitioner's statements that he gave money to churches, schools, Goodwill, the Salvation Army, and like charities. Mr. Urquiola remembered that there was some documentation presented to him regarding the claimed charitable contribution but it was "not 100 percent".

Petitioner urges application of the doctrine of <u>Cohan v. Commissioner</u>, <u>supra</u> at 543-544.  Under the <u>Cohan</u> doctrine, if a taxpayer claims a deduction but cannot fully substantiate it, the court may approximate the allowable amount. Here the single contribution claimed is over $250; thus by statute it does not qualify as a section 170 charitable contribution absent a written receipt from the donee.  See sec. 170(f)(8)(A).[13]

Because petitioner failed to meet the requirements of section 170, he is not entitled to a charitable contribution deduction.  Accordingly, we sustain respondent's adjustment with regard to this issue.

V.   <u>Section 6662 Accuracy-Related Penalty</u>

Under section 7491(c), respondent bears the burden of production with respect to petitioner's liability for the section 6662(a) penalty.  This means that respondent "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty."  See <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001).

---

[13]In order for <u>Cohan</u> to apply, the taxpayer must provide reasonable evidence from which to estimate the deductible amount, and even then the court will bear heavily against the taxpayer. <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 742-743 (1985).  Even if <u>Cohan</u> were applicable, the lack of evidence with respect to the claimed charitable contribution in this case would preclude us from even attempting to approximate the allowable amount of the deduction.

Section 6662(a) imposes an accuracy-related penalty of 20 percent on any underpayment that is attributable to causes specified in subsection (b).  Respondent asserts two causes justifying the imposition of the penalty:  Negligence and a substantial understatement of income tax.  Sec. 6662(b)(1) and (2).

"[N]egligence" includes "any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]".  Sec. 6662(c).  Under caselaw, "'Negligence is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Negligence can also include any failure by the taxpayer to keep adequate records and to substantiate items properly.  Sec. 1.6662-3(b)(1), Income Tax Regs.  A substantial understatement of income tax is an understatement that exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return.  Sec. 6662(d)(1)(A).  In the light of petitioner's failure to keep tax records and substantiate his claimed deductions, respondent has met his burden of production with regard to the section 6662(a) accuracy-related penalty.

There is an exception to the section 6662(a) penalty when a taxpayer can demonstrate: (1) Reasonable cause for the underpayment and (2) that the taxpayer acted in good faith with respect to the underpayment. Sec. 6664(c)(1). Regulations promulgated under section 6664(c) provide that the determination of reasonable cause and good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances". Sec. 1.6664-4(b)(1), Income Tax Regs.

Reliance on professional advice may constitute reasonable cause and good faith, but "it must be established that the reliance was reasonable." Freytag v. Commissioner, supra at 888; see also United States v. Boyle, 469 U.S. 241, 251 (1985); sec. 1.6664-4(b)(1), Income Tax Regs.

> In sum, for a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove * * * that the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. * * *

Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99, affd. 299 F.3d 221 (3d Cir. 2002); see also Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 & n.8 (9th Cir. 2005) (quoting with approval the above three-prong test), affg. 121 T.C. 89 (2003).

Petitioner argues that he should not be held liable for the section 6662(a) penalty because "he was reasonable and prudent [in] hiring an accountant to file his tax return". We analyze petitioner's claims using the three-prong test listed above. With regard to the first prong, petitioner has failed to establish that Mr. Urquiola was a competent professional who had sufficient expertise to justify reliance. "[R]eliance may not be reasonable or in good faith if the taxpayer knew, or reasonably should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law." Sec. 1.6664-4(c)(1), Income Tax Regs. Petitioner hired Mr. Urquiola because he "realized [he] was about to be out of compliance in getting [his] 2005 tax return done" and had been referred to Mr. Urquiola by his mother's boyfriend. While Mr. Urquiola has a degree in accounting, there is no evidence that he is a certified public accountant. Mr. Urquiola did not prepare tax returns full time; rather, he did them "on the side". Accordingly, we find that petitioner has not established that his reliance on Mr. Urquiola was justified.

With regard to the second prong, petitioner must establish that he provided necessary and accurate information with respect to all items reported on his tax return, such that the incorrect return resulted from error on the part of the adviser. See, e.g., Westbrook v. Commissioner, 68 F.3d 868, 881 (5th Cir.

1995), affg. T.C. Memo. 1993-634; <u>Ma-Tran Corp. v. Commissioner</u>, 70 T.C. 158, 173 (1978); <u>Pessin v. Commissioner</u>, 59 T.C. 473, 489 (1972). On the basis of the record, we cannot conclude that petitioner provided Mr. Urquiola with all of the necessary and accurate information. For example, Mr. Urquiola did not remember seeing a bill or receipt for petitioner's claimed insurance expenses; petitioner did not provide him with any Forms 1099 for the claimed commissions and fees expenses; and the documentation presented to Mr. Urquiola regarding the claimed charitable contribution was "not 100 percent". Further, petitioner conceded that he was not entitled to certain of his claimed deductions and that he was liable for tax on interest income that he had not reported on his Form 1040. See <u>supra</u> note 2.

Turning to the third prong, petitioner had a duty to read his tax return to ensure that it was correct. See <u>Magill v. Commissioner</u>, 70 T.C. 465, 479-480 (1978), affd. 651 F.2d 1233 (6th Cir. 1981). Unconditional reliance on a preparer or adviser does not always constitute reasonable reliance; the taxpayer must also exercise "Diligence and prudence". <u>Marine v. Commissioner</u>, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991). Petitioner did not sign the original return and relied entirely on Mr. Urquiola. In the end, reliance on his accountant does not excuse petitioner's failure to closely examine his 2005 tax return. See <u>Pritchett v. Commissioner</u>, 63

T.C. 149, 174 (1974) ("The general rule is that the duty of filing accurate returns cannot be avoided by placing responsibility on an agent."). Petitioner is not permitted to ignore his obligation to ensure that his tax return accurately reflected his income for the 2005 tax year.

On the basis of the above, we hold that petitioner has failed to meet the burden of proof with regard to the section 6664(c)(1) exception. Therefore, we sustain respondent's imposition of a section 6662(a) accuracy-related penalty for petitioner's 2005 tax year.

The Court has considered all of petitioner's contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

Decision will be entered

under Rule 155.